**Hedwige and Herve BRENORD, Plaintiffs,**

v.

**THE CATHOLIC MEDICAL CENTER OF BROOKLYN AND QUEENS, INC., St. Mary's Hospital of Brooklyn, Dr. Fanell Alerte, and Dr. Eugenio Rocksmith, Defendants.**

No. 96 CV 4615(ILG).

United States District Court, E.D. New York.

March 5, 2001.

Daniel Cherner, law Offices of Daniel Cherner, New York City, for Plaintiffs.

Henry Z. Shaub, Shaub, Ahmuty, Citrin & Spratt, L.L.P., Lake Success, NY, Paul M. DeCarlo, Amabile & Erman, P.C., Staten Island, NY, for Defendants.

### MEMORANDUM & ORDER

GLASSER, District Judge.

This action was initiated by plaintiffs Hedwige and Herve Brenord against defendants The Catholic Medical Center of Brooklyn and Queens, Inc., its subsidiary St. Mary's Hospital of Brooklyn, Dr. Fanell Alerte, and Dr. Eugenio Rocksmith in connection with Mrs. Brenord's miscarriage in April 1996. Plaintiffs have alleged claims grounded in the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. §§ 1395dd, as well as claims based on medical malpractice, negligence and negligent infliction of emotional distress. Before the court are motions for summary judgment by all four defendants, as well as plaintiffs' cross-motion for summary judgment and motion to strike. For the reasons that follow, defendants' summary judgment motions are granted as to the federal EMTALA claim, and plaintiffs' motion on that claim is denied, as is plaintiffs' motion to strike. As for the remaining state law claims, summary judgment is denied, and this action is remanded to state court for adjudication of those claims.

### Background

The facts underlying this action are undisputed unless otherwise noted. The Brenords first learned that they would be having a baby sometime in the Fall of 1995. (Complaint ¶ 11; Alerte Dep. 47–48, 57) Mrs. Brenord received routine prenatal care from her obstetrician and gynecologist, Dr. Fanell Alerte. As part of her prenatal care, Mrs. Brenord visited Dr. Alerte at least once: a month between December 1995 and March 1996. (¶ 13)

On April 21, 1996, Mrs. Brenord asked her brother in law to call an ambulance for her because she had a pain in her abdomen and felt nauseous. (¶ 15) Mrs. Brenord was taken by ambulance to St. Mary's Hospital, a subsidiary of The Catholic Medical Center of Brooklyn and Queens. (¶ 7) According to records kept by St. Mary's Hospital, Mrs. Brenord was triaged at approximately 9:40 p.m., at which time her vital signs were taken. Mrs. Brenord had a normal temperature of 98.8 degrees, a normal respiration rate and blood pressure, and a slightly elevated pulse of 117. The triage record reflects her complaints of "slight abdominal pain" and also notes

that she had "passed water." No vaginal bleeding was present. (Rocksmith, Catholic Medical Center and St. Mary's Hospital Defs.' ("Hosp.Defs.'") Ex. B) During her triage, Mrs. Brenord complained of water passing from the vagina but had no bleeding. (*Id.*) St. Mary's Hospital records reflect that, based on her last menstrual period, Mrs. Brenord was 17 weeks pregnant with a due date of October 1, 1996. (*Id.*)

At approximately 10:30 p.m., Mrs. Brenord was taken to the Emergency Room. There, she was seen by defendant Dr. Eugenio Rocksmith, an obstetrics and gynecology resident who was on call at the time. Dr. Rocksmith's pelvic examination of Mrs. Brenord included a sterile speculum test and a nitrazene paper test to determine whether Mrs. Brenord's membranes were ruptured, a sign that she might be going into early labor. Hospital records indicate that the nitrazene test was negative. (*Id.*) Dr. Rocksmith's examination also revealed that Mrs. Brenord's cervix was closed, another sign that she was not going into labor. In addition, several laboratory studies were ordered, including a CBC, urine, SMA 6/12, UCG and C & S. (*Id.*) Hospital records reflect that a pelvic sonogram was also ordered to rule out a ruptured membrane. (*Id.*) Dr. Rocksmith testified, however, that it was his practice only to perform a pelvic sonogram if the patient's nitrazene test came out positive. Plaintiffs maintain that neither a microscopic examinations of fluids nor a sonogram was performed. (Pls.' Local Rule 56.1 Statement, ¶ 11) The blood and urine tests indicated that Mrs. Brenord had a white blood count in the normal range of 8,700 with Hematocrite of 38%. (Hosp. Defs.' Ex. B)

Dr. Rocksmith testified at his deposition that the evaluation note he prepared on April 21, 1996 (*id.*) indicates that, in accordance with his regular practice, he contacted Mrs. Brenord's private attending physician, Dr. Alerte, at some point on the evening of April 21 and that they agreed

during this discussion that Mrs. Brenord should be prescribed Terazol 3 cream for a yeast infection. (Rocksmith Dep. 39, 55, 56, 60) Dr. Rocksmith, however, could not specifically recall having called Dr. Alerte, during his deposition, and, for that matter, had no independent recollection of this entire case other than through the records he was asked to examine during the deposition. (*Id.* at 60, 62, 77) Dr. Alerte testified at his deposition that he knew Dr. Rocksmith but could not recall ever having spoken with him about Mrs. Brenord. (Alerte Dep. 155) The Complaint originally alleged that Dr. Rocksmith contacted Dr. Alerte on April 21, 1996 (while Mrs. Brenord was still at St. Mary's Hospital) and asked him to come to the Hospital for purposes of examining and treating Mrs. Brenord, but that he never came. (¶¶ 21–23) However, plaintiffs seem to have retreated from this position and now claim that Dr. Rocksmith never contacted Dr. Alerte. (Pls.' Local Rule 56.1 Statement, 10)

Mrs. Brenord was moved from the Emergency Room to Labor and Delivery at approximately 11: 10 p.m. on April 21. (Hosp. Defs.' Ex. B) She was discharged at 12:30 a.m. on April 22 with a prescription for Terazol 3 creme. (*Id.*) According to St. Mary's Hospital, Mrs. Brenord was instructed to follow up with her own physician, Dr. Alerte. (*Id.*)

Later that morning, on April 22, Mrs. Brenord awoke with more pain. Her husband attempted to call Dr. Alerte and reached him, but Dr. Alerte put Mr. Brenord on hold and never returned to the phone. Mr. Brenord tried to call Dr. Alerte again, only to be told by someone at his office that Dr. Alerte was busy. (Herve Brenord Dep. 33–34, 36) Having been unsuccessful in reaching Dr. Alerte by phone, Mr. Brenord decided to take his wife to Dr. Alerte's office at around 2:30 p.m. on April 22, 1996. There, Dr. Alerte examined Mrs. Brenord and found that she had a temperature of 98.6 and a fetal heart rate within the normal range and that her

cervix was closed. Dr. Alerte performed a pelvic examination which included a sterile speculum test and a nitrazene test. The nitrazene test was negative. Dr. Alerte did not perform a microscopic examination of fluids or a sonogram. After the examination, Dr. Alerte prescribed Mrs. Brenord a prophylactic antibiotic, ampicillin, and liquid Maalox. (Alerte Dep. 147) Mrs. Brenord went home, but still did not feel well.

After midnight on April 22, that is early in the morning of April 23, Mr. Brenord took Mrs. Brenord back to the St. Mary's Hospital Emergency Room. (Herve Brenord Dep. 41–42) On arrival, she complained of lower abdominal pain and had a temperature of 102.7. A sonogram was performed which revealed that Mrs. Brenord had miscarried. Mrs. Brenord was then treated with intravenous antibiotics and taken to the Operating Room, where a dilation and curetage was performed. She was seen by Dr. Alerte at the hospital "within 3 days of having seen her" on April 22 (Alerte Dep., 160) and discharged on April 27, 1996. Mrs. Brenord's hospital discharge summary reflects that she had an admitting diagnosis of chorioamnionitis, an infection caused when the membranes rupture, and that this infection was resolved at discharge time. (Hosp. Defs.' Ex. B)

Plaintiffs served the underlying Complaint on October 7, 1996. The Complaint alleges that all four defendants violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. §§ 1395dd, by failing to perform an appropriate medical screening examination to determine whether Mrs. Brenord had an emergency medical condition and by failing to provide plaintiff with further medical examination and treatment to stabilize that condition. (Causes of Action 1–6, ¶¶ 49–81) The Complaint further alleges that the defendants committed medical malpractice and negligence by failing to properly treat Mrs. Brenord's medical condition. (Causes of Action 7–9, ¶¶ 82–93) Finally, the Complaint alleged that as a result of the alleged EMTALA violations, negligence and malpractice, both plaintiffs suffered extreme emotional distress. (Causes of Action 10–11, ¶¶ 94–105)

Defendants Rocksmith, Catholic Medical Center, and St. Mary's Hospital have submitted an expert affidavit by Dr. Anthony T. Bozza, a Board-certified obstetrician and gynecologist, which concludes that the care rendered to Mrs. Brenord was in conformity with good and accepted medical standards and that the injuries alleged by Mrs. Brenord were not a proximate cause of the care and treatment provided by the staff at St. Mary's Hospital and Dr. Rocksmith. These defendants have also submitted an expert affidavit by Dr. Jose J. Fernandez, a Board-certified internist and emergency medicine specialist, which contains essentially the same opinions. Plaintiffs have submitted an expert affidavit by Dr. Salah Mahmoud which states that Mrs. Brenord should have been admitted and given further medical treatment on April 21, 1996 but also that the repeated pelvic examinations on April 21 and 22, 1996 in unsterile conditions caused Mrs. Brenord to develop chorioamnionitis on April 23, 1996.[1]

## Discussion

### 1. Summary Judgment Standard

Before examining the facts underlying this motion, it is important to recall the criteria by which a motion for summary judgment is determined. Summary judgment "shall be rendered Forthwith if the

---

1. Dr. Mahmoud's expert report was first submitted to this court in unsworn form as an exhibit to plaintiffs' Cross–Motion for Summary Judgment. In the Reply Affidavit of Mamie Stathatos, defendants Rocksmith, Catholic Medical Center, and St. Mary's Hospital objected to the form of this report under Fed.R.Civ.P. 56(e) insofar as it was not sworn to by the alleged expert. Plaintiff subsequently re-submitted Dr. Mahmoud's report as an exhibit to his sworn affidavit of January 22, 2001, thus curing the deficiency noted by defendants.

pleadings, depositions ... together with the affidavits ... show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "moving party is 'entitled to judgment as a matter of law' [if] the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a summary judgment motion, a court need not resolve disputed issues of fact, but need only determine whether there is any genuine issue to be tried. *Eastman Mach. Co. Inc. v. U.S.,* 841 F.2d 469, 473 (2d Cir. 1988). A disputed fact is material only if it might affect the outcome of the suit under the governing law. A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a reasonable jury could return a verdict in her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

## 2. The EMTALA Statute

EMTALA was enacted in 1986 amid growing concern over the availability of emergency health care services to the poor and uninsured. *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1039 (D.C.Cir.1991). The statute was specifically designed to respond to "a growing concern that hospitals were 'dumping' patients unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized." *Brooks v. Maryland General Hospital, Inc.,* 996 F.2d 708, 710 (4th Cir.1993). It provides, in pertinent part:

(a) Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individuals behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

(b) Necessary stabilizing treatment for emergency medical conditions and labor

(1) ... If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition; or (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. §§ 1395dd(a) and (b)(1) (1997). The statute defines an "emergency medical condition" as:

a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual ... in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part . . .

42 U.S.C. § 1395dd(e)(1)(A) (1997).

 Courts have held that in order to comply with the "appropriate medical screening" requirement of this section, the hospital must provide "treatment that is equal, as opposed to treatment that meets professional standards of competence." *Fisher*, 989 F.Supp. at 449. Thus, a hospital fulfills the appropriate screening requirement "when it conforms in its treatment of a particular patient to its standard screening procedures. By the same token, any departure from standard screening procedures constitutes inappropriate screening in violation of [EMTALA]." *Id.* (quoting *Gatewood*, 933 F.2d at 1041.) "The appropriateness of the screening examination is determined by reference to how the hospital treats other patients who are perceived to have the same medical condition . . . That is true even if the hospital's perception of a particular patient is based on a misdiagnosis; EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment." *Id.* (citing *Vickers v. Nash General Hospital, Inc.*, 78 F.3d 139, 143 (4th Cir.1996); *see also Summers v. Baptist Medical Center*, 91 F.3d 1132, 1139 (8th Cir.1996)).

 EMTALA was "not intended to duplicate preexisting legal protections, but rather to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat." *Gatewood*, 933 F.2d at 1041. Thus, EMTALA is not a federal medical malpractice statute, *Repp v. Anadarko Municipal Hospital*, 43 F.3d 519, 522 (10th Cir.1994); *Power v. Arlington Hospital Ass'n*, 42 F.3d 851, 856 (4th Cir.1994), and most questions related to the adequacy of a hospital's standard screening procedure "must remain the exclusive province of local negligence law." *Gatewood*, 933 F.2d at 1041 (citing *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271–72 (6th Cir.1990)); *Stewart v. Myrick*, 731

F.Supp. 433, 436 (D.Kan.1990) (claim for improper emergency room diagnosis and treatment "falls within ambit of state negligence law, not the federal anti-dumping law"); *Evitt v. University Heights*, 727 F.Supp. 495, 497 (S.D.Ind.1989) (same). Since EMTALA was not enacted to remedy negligent diagnosis, only refusals to follow regular screening procedures violate the statute. *Fisher*, 989 F.Supp. at 449 (citing *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir.1994)). Faulty screening in a particular case, as opposed to disparate screening or refusing to screen at all, does not violate the statute. *Id.* (citing *Correa v. Hospital San Francisco*, 69 F.3d 1184, 1192 (1st Cir.1995)).

With respect to EMTALA's stabilization and transfer requirements, courts have found that those provisions are only triggered after a hospital "determines that [an] individual has an emergency medical condition." *Gatewood*, 933 F.2d at 1041 (quoting 42 U.S.C.A. §§ 1395dd(b)(1), (c) and holding that, because no such condition was diagnosed, EMTALA's stabilization and transfer requirements were inapplicable).

 Thus, in order to state a claim under EMTALA, a plaintiff must allege that she went to the emergency room of a participating hospital seeking treatment for a medical condition, and that the hospital either did not screen her in the same way it screened other patients to determine whether she had an emergency medical condition, or discharged or transferred her before such a condition had been stabilized. *Fisher*, 989 F.Supp. at 448.

With respect to an aggrieved individual's private right of action, EMTALA provides:

(A) Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the

hospital is located, and such equitable relief as is appropriate.

42 U.S.C. § 1395dd(d)(2)(A) (1997).

Most courts that addressed the issue of whether EMTALA creates a private cause of action against individual physicians have ruled that it does not. *See, e.g., Fisher,* 989 F.Supp. at 448.[2] *See also Eberhardt v. Los Angeles,* 62 F.3d 1253, 1256 (9th Cir. 1995); *King v. Ahrens,* 16 F.3d 265, 271 (8th Cir.1994); *Delaney v. Cade,* 986 F.2d 387, 393–94 (10th Cir.1993); *Baber v. Hospital Corporation of America,* 977 F.2d 872, 876–878 (4th Cir.1992); *Gatewood,* 933 F.2d at 1040 n. 1.

### 3. Defendants Rocksmith, Catholic Medical Center, and St. Mary's Hospital's Joint Motion for Summary Judgment

#### A. EMTALA Claims

█ Defendant Rocksmith has argued, and plaintiffs have conceded, that liability against individual physicians is not available under EMTALA. Thus, the only claims that are available against Rocksmith are plaintiffs' medical malpractice and negligence claims, which are supplemental to the EMTALA claim and will be considered only after the discussion of the EMTALA claim.

**2.** As Judge Gleeson noted in *Fisher,* both the plain language of the statute and its legislative history confirm this view:

> The text of the statute virtually precludes the implication of a private right of action against physicians. Congress obviously considered enforcement mechanisms against participating hospitals and physicians, and chose to provide a private right of action against only hospitals, 42 U.S.C. § 1395dd(d)(2)(A), while authorizing the Secretary of Health and Human Services to proceed administratively against both hospitals and physicians. 42 U.S.C. §§ 1395dd(d)(1) & (2)(B). There is no support on the face of the legislation for upsetting that determination by allowing aggrieved persons to sue emergency room physicians.

#### i. EMTALA's Medical Screening Requirement

Defendants Catholic Medical Center and St. Mary's Hospital argue that summary judgment is appropriate on plaintiff's EMTALA claim because plaintiffs have shown no genuine issue of material fact as to a breach by St. Mary's Hospital of the duty to provide appropriate medical screening under this statute. "Appropriate medical screening," is provided when a hospital "conforms in its treatment of a particular patient to its standard screening procedures." *Fisher,* 989 F.Supp. at 449. As such, the statute is unconcerned with the adequacy of the screening procedures, but rather with whether the hospital refused to follow its regular screening procedures equally. In *Fisher,* the court denied plaintiff's EMTALA claim because it found that plaintiff had failed to establish, in arguing that the hospital had failed to order blood tests, x-rays and other purportedly necessary diagnostic tests, that defendants had violated EMTALA's mandate of equal treatment. Even assuming that defendants were negligent in failing to order those tests, the court in *Fisher* found that such negligence was insufficient to establish the disparate treatment required for liability to be imposed under EMTALA. *Id.* at 449 (citing *Summers v. Baptist Medical Center of Arkadelphia,* 91 F.3d 1132, 1138 (8th Cir.1996)).

> The legislative history confirms that Congress intentionally limited the private action to claims against hospitals. An earlier draft of the provision, which simply granted patients a cause of action, was rejected because it "did not precisely identify which parties could bring actions under the provisions, nor did it identify those against whom they could bring such action." H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 3, at 6 (1986), reprinted in 1986 U.S.C.C.A.N. at 42, 579, 728. The Committee Report stated that amending the provision to its present language "clarifies that actions for damages may be brought only against the hospital which has violated the requirements of § 124." *Id.* at 6–7, reprinted at 1986 U.S.C.C.A.N. at 728; *see also Baber,* 977 F.2d at 877.
>
> *Fisher,* 989 F.Supp. at 448.

█ Plaintiffs in this case do not allege that St. Mary's Hospital failed to treat Mrs. Brenord. There is no question that Mrs. Brenord was treated on April 21, 1996. Instead, plaintiffs have alleged that staff at St. Mary's Hospital failed to adequately screen Mrs. Brenord on April 21, 1996. The question therefore becomes whether St. Mary's deviated from the standard procedures followed in all other cases. This inquiry "does not mean that any slight deviation by a hospital from its standard screening policy violates EMTALA. Mere de minimis variations from the hospital's standard procedures do not amount to a violation of hospital policy. To hold otherwise would impose liabilities on hospitals for purely formalistic deviations when the policy had been effectively followed." *Repp v. Anadarko Municipal Hospital*, 43 F.3d 519, 523 (10th Cir.1994).

The standard procedure of St. Mary's Hospital concerning the screening of pregnant women is set forth in Exhibit "F" to its Notice of Motion and provides in pertinent part:

Procedure: The Emergency Department Triage Nurse will:

1. Triage each pregnant patient presenting to the Emergency Department as outlined in policy and procedure number 9.1.1.

2. Document the patient's expected date of confinement (EDC) and last menstrual period (LMP) on the triage form.

3. Assess the patient for signs and symptoms of active labor.

5. A pregnant woman estimated to be less than 20 weeks gestation is to be assigned to a treatment area appropriate to her needs.

(Hosp. Defs.' Ex. F)

The record clearly reflects that Mrs. Brenord was screened in accordance with this procedure. On arrival at the Emergency Room of St. Mary's Hospital, Mrs. Brenord was triaged. The triage nurse documented that she did not have any allergies and that she was not taking any medications. Mrs. Brenord was noted to be alert, her vital signs were taken, and her language capabilities were noted. In addition, it was noted that Mrs. Brenord had passed water and complained of lower abdominal pain and that she showed no evidence of vaginal bleeding. Based on the information provided by Mrs. Brenord about her last menstrual period, the hospital determined that she was approximately 17 weeks pregnant. Because she was less than 20 weeks gestation, she was assigned to a treatment area which the triage nurse felt to be appropriate to her needs. *Id.* Thus, the record clearly shows that St. Mary's Hospital did not materially deviate from its standard screening procedures on April 21, 1996.

Plaintiffs have submitted an expert report by Dr. Mahmoud that does nothing to alter this result. Before the court considers the opinions contained in that report, it should be noted that serious questions exist as to whether Dr. Mahmoud qualifies as an expert under the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Dr. Mahmoud has testified as a medical legal expert only once in a case involving amnesia, not complications arising during pregnancy.[3] (Mahmoud Dep. 11–12, 17) During his

---

**3.** Under the law of this Circuit, Dr. Mahmoud's lack of experience testifying as an expert is insufficient to disqualify him from offering testimony in this case. *See Washington v. Schriver*, No. 00–2915, slip op. 1001, 1021 (2d Cir. Feb. 14, 2001) (noting that a rule precluding testimony by experts who have never previously qualified as experts in this state would "be illogical because it would preclude any new expert from testifying in New York, no matter what his qualifications and no matter what relevance his testimony has."). However, the fact that his previous testimony was not even related to issues raised in this case is relevant insofar as it

deposition in this case, Dr. Mahmoud testified that he is not board certified in either obstetrics and gynecology or emergency medicine (*id.* at 27) and has never published anything in the area of obstetrics or anything in this country in either obstetrics or gynecology or emergency medical management. (*Id.* at 31) His expertise, it seems, comes from the fact that he received a "masters degree" in obstetrics and gynecology from Egypt (*id.* at 76), which he alleges is equivalent to board certification in the United States, has taught obstetrics in Egypt and Saudi Arabia, and has "some experience in the emergency room" and "experience back home[.]" (*Id.* at 106–107). Dr. Mahmoud further testified that "anybody [who] has basic knowledge about this problem he can review the charts because this is not an operation or a procedure to be done … this is paperwork."; and that "anybody [who] has basic knowledge of OB/GYN can review what's been done was right or not." (*Id.* at 106–107, 109) Finally, despite stating in his (subsequently) sworn report that he reviewed the deposition testimony of Drs. Rocksmith and Alerte (Mahmoud Rep. 2), Dr. Mahmoud admitted at his deposition that, prior to testifying, he had not reviewed anything except the medical records in this case. (*Id.* at 17–23) These facts alone raise serious questions over Dr. Mahmoud's qualification as an expert under Federal Rules of Evidence 702 and 703 and prompt the court to note that although defendants have not moved to exclude Dr. Mahmoud's report on the ground that he is not qualified to serve as an expert, had such a motion been before the court, it

would have likely been granted.[4] Accordingly, although the court considers Dr. Mahmoud's opinions here, it does so with a cautionary eye in view of both his dubious qualification as an expert and the questionable factual basis for those opinions.

■ Considering first whether Dr. Mahmoud's report substantiates plaintiffs' claim that St. Mary's Hospital failed to screen Mrs. Brenord in accordance with its standard screening procedures, the report simply argues that Mrs. Brenord failed to receive a *"proper* medical screening examination." In attempting to define what a proper screening would consist of when a patient's diagnosis is "R/O ruptured membrane," Dr. Mahmoud states:

> In such a situation, the doctor should conduct three tests or exams: (i) a nitrazene paper test; (ii) a microscopic examination of the fluid; and (iii) a clinical examination and/or ultrasound examination to determine fetal viability. These tests or exams are essential to determination of the patient's condition and the fetal condition, and are known to me to be the appropriate tests based on my medical training and experience in obstetrics and gynecology.

(Mahmoud Rep., 1) While Dr. Mahmoud's opinion as to what tests should have been performed by St. Mary's Hospital might support plaintiffs' negligence claim, it does not substantiate an EMTALA violation. Liability under EMTALA is not established through a showing of what an appropriate medical screening should have entailed in a particular case. Instead,

---

demonstrates his lack of familiarity with those issues.

4. The ability of a district court to evaluate expert testimony *sua sponte* and exclude such testimony where appropriate has been recognized by several courts. *See e.g., Kirstein v. Parks Corp.,* 159 F.3d 1065, 1067 (7th Cir. 1998) ("we have not required that the *Daubert* inquiry take any specific form and have, in fact, upheld a judge's *sua sponte* consideration on the admissibility of expert testimony"), *cert. denied,* 526 U.S. 1065, 119 S.Ct. 1456, 143 L.Ed.2d 542 (1999); *Proujansky v.*

*Blau,* 1999 WL 124457, *1 (S.D.N.Y. Mar. 8, 1999) (raising question of admissibility *sua sponte*); *Fellner v. Supreme Corp.,* 1995 WL 79787, *3 (D.N.J. Feb. 21, 1995) (same). While the court here does not exclude Dr. Mahmoud's expert report, its inquiry into Dr. Mahmoud's qualification to serve as an expert is governed by the recognition that under *Daubert* the district court serves as a "gatekeeper" of expert testimony and must determine whether the expert's testimony is reliable enough to be submitted to the jury.

"[t]he appropriateness of the screening examination is determined by reference to how the hospital treats other patients who are perceived to have the same medical condition.... EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment." *Fisher*, 989 F.Supp. at 449.

Dr. Mahmoud's opinion is also offered as support for plaintiffs' argument that the screening of Mrs. Brenord at St. Mary's Hospital on April 21, 1996 was performed in an unsterile environment and that this environment "caused Mrs. Brenord to get an infection, which caused chorioamnionitis, [an infection of the membranes] and caused her to lose the fetus." (Pls.' Opp'n at 12) Dr. Mahmoud concludes in his report that Mrs. Brenord developed chorioamnionitis because of "improper diagnoses by Rocksmith and Dr. Alerte on April 21 and 22, 1996; by improper treatment by St. Mary's Hospital, Rocksmith, and Dr. Alerte, on April 21 and 22, 1996; and by repeated vaginal examinations on April 21 and 22, 1996, which should be performed only under sterile and aseptic conditions." (Mahmoud Rep. 2) When questioned during his deposition about the basis for the last of these causes, Dr. Mahmoud opined that the nitrazene test performed by Dr. Rocksmith introduced e-coli, a bacteria normally found in the colon, to Mrs. Brenord's uterus when it was "swabbed from the rectum to the vagina up to ruptured membrane which gives this problem."

(Mahmoud Dep., 101; Mahmoud Rep., 2) This opinion, again, is more pertinent to an analysis of causation under plaintiffs' negligence and malpractice claims. Even assuming, however, that plaintiffs were somehow relying on it for purposes of EMTALA to show that Dr. Rocksmith screened Mrs. Brenord under conditions that were inferior or less sterile than those conditions provided under the Hospital's regular screening procedures, plaintiffs have failed to offer any proof whatsoever that conditions during that examination were unsterile. Nor does Dr. Mahmoud's opinion establish that conditions during Mrs. Brenord's examination must have differed from regular conditions because Mrs. Brenord was subsequently diagnosed with chorioamnionitis on April 23, 1996. Dr. Mahmoud himself acknowledged in his deposition that he could not state with a reasonable degree of medical certainty whether the organism that causes chorioamnionitis was introduced by the examination of April 21, 1996 or whether it was already present on that date. Finally, Dr. Mahmoud's own theory of infection, under which the e-coli may reach the uterus through ruptured membranes, casts significant doubts upon his conclusion that an unsterile swab caused Mrs. Brenord's chorioamnionitis, since Mrs. Brenord was given two tests for ruptured membranes—on April 21, 1996 by Dr. Rocksmith and on April 22, 1996 by Dr. Alerte[5]—both of which were negative.[6]

---

5. That the test performed by Dr. Rocksmith was negative is not disputed by plaintiffs with anything other than a tortuous colloquy from Dr. Mahmoud's deposition in which he insists both that a zero with a dash through it was not the proper way to record a negative test result (Mahmoud Dep. 45–55) and that the result may have been a false negative. (*Id.* at 57–58) Dr. Mahmoud does not question that the nitrazene test performed by Dr. Alerte was negative. (*Id.* at 63–64)

6. As mentioned earlier, defendants Rocksmith, Catholic Medical Center and St. Mary's Hospital have submitted expert affidavits by Drs. Bozza and Fernandez. Because both of these affidavits deal primarily with defendants' argument that the care and treatment rendered to Mrs. Brenord was appropriate and within the realm of acceptable medical practice, they are directed towards refuting plaintiffs' malpractice and negligence claims and are not considered in detail here. However, it should be noted that both affidavits state that, having conducted a nitrazene test and a complete pelvic examination of Mrs. Brenord on April 21, 1996, Drs. Rocksmith and Alerte could determine that Mrs. Brenord's membranes were not ruptured and that she was not in active labor. Moreover, as submitted by defendant Alerte's expert, Dr. Guidetti, even if ruptured membranes were discovered on April 21, 1996, the course of action that most likely would have been taken

Nor is the attempt of plaintiffs' counsel to argue that Mrs. Brenord received disparate treatment sufficient to establish a material issue of fact on plaintiffs' EMTALA claim. Counsel first argues that Dr. Rocksmith failed to follow standard hospital procedure when he did not consult with an attending physician. Even accepting for the purposes of argument that Dr. Rocksmith did not consult with Dr. Alerte or another attending physician, the only source supplied by plaintiffs for the requirement that a resident contact an attending physician is Dr. Rocksmith's own description of his customs and practices. (Rocksmith Dep. 22, 60, 145) That is simply not the same, for purposes of EMTALA, as a hospital's regular screening procedures. Nor do plaintiffs succeed in establishing such a procedure existed in their Reply Memorandum, which simply recites lengthy provisions of New York State Hospital Code, 10 N.Y.C.R.R. §§ 405.19(d)(1)(ii), (e)(1) and (e)(2) and § 405.4(f)(2), that deal with emergency service staffing.[7] (Pls.' Opp'n, 5–8) Even assuming that screening procedures at St. Mary's Hospital should have been in accordance with these state law provisions, the fact that they might not have been does not demonstrate that St. Mary's deviated from its own screening procedures, a showing which is essential to an EMTALA claim. Also, even if plaintiffs could demonstrate that St. Mary's Hospital did have written policies that complied with these state laws, it is not at all clear that such policies would constitute part of the hospital's "standard screening procedures" if they were uniformly ignored by hospital staff.

Plaintiffs' counsel next argues that, despite Mrs. Brenord's classification as a Level III patient, a classification of "Urgent—a patient who will require therapeutic intervention within 30–60 minutes" (Hosp. Defs' Ex, B, Index 9.1.1 at 3), Mrs. Brenord "did not receive the medical screening and treatment required of which defendant hospitals give to other individuals." (Pls.' Opp'n, 10) Counsel's statement is insufficient to establish that Mrs. Brenord was not screened in accordance with hospital policy, as the record in this case demonstrates that Mrs. Brenord was triaged by a nurse at 9:40 p.m. and seen by a doctor when she was taken to the Emergency Room at 10:37 p.m. (Hosp. Defs.' Ex. B) Nor does counsel's suggestion that Mrs. Brenord might have been classified incorrectly establish an EMTALA violation, as that argument, again, would go to the issue of medical malpractice or negligence, not disparate treatment under EMTALA.

Finally, plaintiffs argue that liability under EMTALA can be inferred from

would have been a pregnancy termination, since fetuses weighing under 400 grams "are considered pre-viable, with no chance of survival." (Guidetti Rep. 2) Even according to Dr. Mahmoud, fetuses weighing under 500 grams have at most a 25 percent chance of survival when the membranes are prematurely ruptured, with a very little chance of fetal survival and considerable maternal risk. (Mahmoud Dep. 33, 44)

7. The portion of these regulations which concern supervision of residents by attending physicians provide that individuals in approved postgraduate medical training programs in training programs may provide patient care in training programs where such individuals do not otherwise have active medical staff privileges if supervision is provided, in relevant part, by:

 physicians who are board-certified or admissible in [obstetrics] or who have completed a minimum of four postgraduate years of training in such specialty. There shall be a sufficient number of these physicians present in person in the hospital 24 hours per day, seven days per week to supervise the postgraduate trainees in their specific specialties to meet reasonable and expected demand. In hospitals that can document that the patients' attending physicians are immediately available by telephone and readily available in person when needed, the onsite supervision of routine hospital care and procedures may be carried out in accordance with paragraph (2) of this subdivision by postgraduate trainees who are in their final year of postgraduate training, or who have completed at least three years of postgraduate training . . .

10 N.Y.C.R.R. § 405.5(f)(2).

the fact that defendants' refusal to treat Mrs. Brenord was premised on an improper motive, assuming that such a motive is required under EMTALA.[8] Specifically, plaintiffs argue that: "there is ample fodder for such proof here: Plaintiffs are Haitian, are black, and speak English with an accent; Ms. Brenord spoke little English at the time of the incidents complained of herein." (Pls.' Opp'n, 9 n. 2) Setting aside for a moment the question of whether an improper motive is required under EMTALA's disparate screening provisions, plaintiffs fail to offer any evidence whatsoever that the staff at St. Mary's Hospital discriminated against plaintiffs. The fact that plaintiffs are Haitian and that Mrs. Brenord had limited proficiency in English is simply descriptive, not evidence that the hospital acted with an improper motive.

As such, plaintiffs have failed to show that St. Mary's Hospital materially deviated from its routine screening procedures during Mrs. Brenord's visit to the Emergency Room on April 21, 1996.

### ii. EMTALA's stabilization requirement

▆▆▆ Nor do plaintiffs demonstrate a genuine issue of material fact as to whether defendants violated the stabilization requirement of EMTALA. That requirement is only triggered if a hospital determines that an emergency medical condition exists and provides that a hospital that makes such a determination must provide for such further medical examination and such treatment as may be required to stabilize the medical condition, or for transfer to another medical facility. *See* 42 U.S.C. § 1395dd(b). A hospital that does not determine that there is an emergency medical condition has no duty under EMTALA to perform a further examination and stabilize the medical condition. *See Gatewood*, 933 F.2d at 1041. Nor does EMTALA "hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." *Vickers v. Nash Gen. Hosp.*, 78 F.3d 139, 145 (4th Cir.1996).

▆▆▆ In this case, plaintiffs have unequivocally failed to establish that defendants determined that Mrs. Brenord had an emergency medical condition on April 21, 1996. The triage and emergency room records clearly demonstrate that Mrs. Brenord presented with "slight abdominal pains" and "no vaginal bleeding[.]" (Hosp. Defs.' Ex. B) Dr. Rocksmith, who examined Mrs. Brenord on April 21, 1996, noted that she had white vaginal discharge, which Dr. Rocksmith believed to be a yeast infection and treated accordingly with a prescription of Terazol 3 cream. Moreover, Dr. Rocksmith performed a nitrazene test on Mrs. Brenord to determine if her membranes were ruptured, and that test produced negative results, indicating that Mrs. Brenord was not losing amniotic fluid due to ruptured membranes. (Rocksmith Dep. 39–40) Finally, Dr. Rocksmith examined Mrs. Brenord to determine

8. This parties' briefing on this issue, it should be noted, is framed within counsel's vehement disagreement as to whether the *Fisher* case requires an improper motive in order to establish a hospital's refusal to follow regular screening procedures. Defendants' reading of *Fisher* is that an improper motive, which plaintiffs do not here establish, is required before a refusal to treat can be found under EMTALA; plaintiffs argue, in contrast, that *Fisher* does not impose such a requirement and that defendants' erroneous citation of *Fisher* is inappropriate, sanctionable, and childish. (Pls.' Mem, 9–10; Pls.' Reply Mem. 9–10) Although this court need not conclude that the hospital had an improper motive in order to dismiss plaintiffs' EMTALA claim here, in view of plaintiffs' failure to establish that the hospital deviated from its standard screening procedures, defendants' argument that *Fisher* requires an improper motive before a refusal to treat can be found under EMTALA is an exaggerated reading of *Fisher*. That case simply states that the statute is violated not by "faulty screening in a particular case" but by "disparate screening or refusing to screen at all...." 989 F.Supp. at 449. That said, it falls short of sanctionable conduct on the part of defendants' counsel.

whether she was going into premature labor. He noted on the emergency room record "pelvic· slowly on closed, slash, thick,·slash long," which he explained during his deposition meant "that the uterus was in its normal state, meaning it wasn't—meaning the uterus was not about to deliver the baby, meaning that the patient was not in labor or meaning that the patient was not in early labor." (*Id.* at 43)

Again, plaintiffs' expert, Dr. Mahmoud, fails to establish that defendants were aware of an emergency medical condition that would have triggered their duty under EMTALA to stabilize Mrs. Brenord. Rather than argue that defendants were aware of such a condition, Dr. Mahmoud simply argues that defendants should have performed additional diagnostic testing on Mrs. Brenord, including a microscopic examination of fluids under a microscope and a sonogram, and that such additional testing might have revealed[9] an emergency medical condition.[10] Even accepting as true Dr. Mahmoud's assertion that good medical practice would have dictated that such additional testing should have been performed, it does nothing to alter the fact that defendants did *not* determine that an emergency medical condition existed. As both the language of EMTALA itself and case law interpreting the Act clearly provide, a hospital's duty to stabilize is not triggered unless the hospital "has actual knowledge of the individual's unstabilized emergency medical condition." *Summers*, 91 F.3d at 1140; *see also* 42 U.S.C. § 1395(b)(1). Accordingly, summary judgment is warranted on plaintiffs' EMTALA claims against both hospital defendants.

## B. Medical Malpractice/Negligence Claims

Having found that no genuine issue exists as to plaintiffs' EMTALA claim against either Rocksmith or the hospital defendants, the only remaining claims against all defendants are claims of medical malpractice and negligence, including a claim for negligent infliction of emotional distress, all grounded in New York .state law. This court has discretion to dismiss the supplemental state law claims, *see* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), but need not do so. *Palmer v. Hospital Authority of Randolph County*, 22 F.3d 1559, 1567–68 (11th Cir. 1994); *Fisher*, 989 F.Supp. at 450 (declining to dismiss state law malpractice claim). The court in *Fisher* declined to dismiss a malpractice claim that was supplemental to an EMTALA claim which it previously dismissed. *Id.* The reasons which the court offered for .its decision not to dismiss the state malpractice claim were twofold: first, the delay that would inevitably follow a remand to state court, which would be

---

**9.** Dr. Mahmoud's report does not claim that more thorough screening would have revealed that Mrs. Brenord's membranes had ruptured, but only that the failure to perform such screening itself constituted inadequate treatment. Specifically, he states:

> Neither a microscopic examination, nor a clinical examination or ultrasound to determine fetal viability were performed on Mrs. Brenord on April 21, 1996. These tests should have been performed, and because they were not Ms. Brenord did not receive proper treatment at St. Mary's Hospital on April 21, 1996.... Of course, this lack of care also means that Ms. Brenord was not properly examined at St. Mary's Hospital emergency room on April 21, 1996. She should have been admitted and given further medical treatment.

(Mahmoud Rep. 2) Moreover, that an emergency medical condition did not in fact exist was reluctantly acknowledged by Dr. Mahmoud during his deposition when he testified at his deposition that Mrs. Brenord did not have a medical condition that required her "to stay in the emergency room" but only one which required·her to "stay in the hospital" because of an "impending" or "serious" condition. (Mahmoud Dep. 102–103)

**10.** Although not essential to resolution of this claim, the court also notes that this theory seems highly implausible given the other conclusion reached by Dr. Mahmoud that it was the repeated examinations of Mrs. Brenord by Drs. Rocksmith and .Alerte that caused the infection that led to Mrs. Brenord's miscarriage.

particularly inappropriate since the plaintiff, a child who had been injured four years earlier during the course of a snowball fight, "continues to suffer from the malpractice"; and, second, both sides wished the case to remain in federal court. *Id.* Although cognizant of its discretion to retain jurisdiction over plaintiffs' supplemental claims in this case, the court declines to exercise that discretion. None of the concerns which prompted the court in *Fisher* are present here. Unlike *Fisher*, the impact of the alleged malpractice is not continuous, as Mrs. Brenord has not alleged that she has been exposed to lasting physical harm. In addition, at least one of the parties, defendant Dr. Alerte, does not wish to remain in federal court in the event the federal claims are dismissed. (Alerte Def.'s Mem., 16–18). As such, the court finds that plaintiffs' state law claims should be decided in state court.

### 4. Defendant Alerte's Motion for Summary Judgment

Like defendant Rocksmith, defendant Alerte has argued, and plaintiffs have conceded, that liability against individual physicians is not available under EMTALA. Thus, only plaintiffs' medical malpractice and negligence claims are available against Alerte. For the same reasons discussed above, the state law claims against defendant Alerte should be remanded to the state court.

### 5. Plaintiffs' Cross–Motion for Summary Judgment

Having granted summary judgment against plaintiffs on their EMTALA claim, which is the only basis for federal jurisdiction, plaintiffs' cross-motion for summary judgment as to that claim is denied. For the same reasons articulated above, consideration of plaintiffs' medical malpractice and negligence claims are best left to the state court, and plaintiffs' cross-motion for summary judgment against defendants on those claims is therefore denied.

### 6. Plaintiffs' Motion to Strike

Filed on the morning before oral argument on the motions was to be heard, was plaintiffs' assertion that having served the defendants with a Notice to Admit in accordance with Rule 36, Fed.R.Civ.P., to which they did not respond, the matters itemized in that Notice are admitted and warrant judgment for them. The impropriety of this twelfth hour Notice of Motion aside, it bespeaks a misguided view of Rule 36. An examination of the notice reveals that it repeats, virtually verbatim, the allegations of the Complaint which the defendants have denied in their answers. Those denials should not be required to be repeated by a response to a Notice to Admit. In directing that the defendants need not respond to that Notice, the Magistrate Judge was applying good law as well as good sense, and plaintiffs' criticism of that judicial officer for doing so was uninformed. The requests for relief contained in this meritlessly belated motion, including a request for sanctions, are also denied.

### Conclusion

For the foregoing reasons, all four defendants' motions for summary judgment on the EMTALA claim are granted and plaintiffs' cross-motion for summary judgment on that claim is denied. As to the supplemental state law claims, this action is transferred to the state court for adjudication of those claims. Accordingly, defendants' motions and plaintiffs' cross-motion for summary judgment on the state law claims is denied. As for plaintiffs' motion to strike, that too is denied.

SO ORDERED.